SAMUEL F. EDWARDS, Appellant, *v.* THE NEW YORK AND HARLEM RAILROAD COMPANY, Respondent.

There is no implied warranty upon the demise of real estate that it is fit for occupation or suitable for the purpose for which it is leased.

Although where the owner leases premises, knowing that they are dangerous and unfit for the use for which they are hired, and fails to disclose their condition, he is guilty of negligence, and may be held responsible for injuries directly resulting therefrom ; if he has created no nuisance and is guilty of no willful wrong or fraud, or culpable negligence, he is not liable for an injury suffered by a person occupying or going upon the premises during the term.

There is no distinction in these respects between a lease of a dwelling-house and of premises to be used for public purpose. (RUGER, Ch. J., DANFORTH and FINCH, JJ., dissenting.)

Negligence of a landlord may not be inferred simply from the fact that a structure on the demised premises breaks down ; to charge him therewith the facts must show that he knew, or had reason to know, that the structure was dangerously weak and imperfect.

Defendant leased a building, which was designed for public entertainments, to one K., to be used for the purpose of a pedestrian exhibition, the tenant to make any and all such changes in the interior of the building, its appointments and fixtures as he might see fit; there was no agreement on the part of the landlord to make any changes or repairs. There was at the time a gallery in the building, which was built under the supervision of an architect, to accommodate a limited number of people. It was divided into boxes, in each of which was a table and chairs, so that the occupants could be served with refreshments while witnessing the performance. The structure was suitable for this purpose, and had been so

used when various festivals were held in the building, a higher price being charged for persons entering the gallery than for admission to other parts of the building, but it was not suitable for such an exhibition. The tables and chairs were removed, and during the exhibition the same price was charged for admission to the gallery as to the rest of the building. The boxes were crowded with noisy and turbulent people, stamping and keeping time with the music; in consequence thereof the gallery fell, and plaintiff, who was beneath it, was injured. In an action to recover damages for the injuries, *held* (RUGER, Ch. J., DANFORTH and FINCH, JJ., dissenting), that in the absence of evidence tending to show defendant knew, or had reason to suppose, that there was some defect in the gallery, or that it was of insufficient strength to hold the number of people who could be contained therein, or that it would be used in such a way as to endanger its security, the testimony failed to show any actionable negligence, and that plaintiff was properly nonsuited.

*Swords* v. *Edgar* (59 N. Y. 28), *Camp* v. *Wood* (76 id. 92), *Francis* v. *Cockrell* (L. R., 5 Q. B. 501), *Grote* v. *C. & H. R. Co.* (2 Exch. 251), distinguished.

/ 3t trial 25 Hun 634

(Argued December 8, 1884 ; decided March 3, 1885.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made May 12, 1882, which affirmed a judgment in favor of defendant, entered upon an order nonsuiting the plaintiff on trial.

This action was brought to recover damages for injuries sustained by plaintiff by the falling of a gallery in a building in the city of New York designed for public entertainments, known as Gilmore's Garden, which building was leased by defendant to one Kelly, for the purpose of giving a pedestrian exhibition therein. It was conceded upon the trial that "the gallery in question was built simply to accommodate a limited number, and not to be used for the purpose of such an exhibition as the walking match."

The method of its arrangement for use as well as the other material facts are stated in the opinion.

*Samuel D. Morris* for appellant. 'The defendant, by letting this hall for public purposes, held out to the public that it was safe, and it was bound to exercise proper care in providing safe accommodations for the people invited to the

hall; and the question whether there was a breach of this duty should have been submitted to the jury. (*Camp* v. *Wood*, 76 N. Y. 92.)

*Frank Loomis* for respondent. The owner of real property is not responsible for injuries arising out of the way in which it is used by others who are not his servants or part of his family. Having let and transferred the possession and control to the hirer, the owner is not responsible for defects subsequently arising therein, much less for any wrongful use or mismanagement of the property by the hirer. (Shearman & Redfield on Negligence, [2d ed.], §§ 495, 501, 503; Taylor's Landlord and Tenant, § 175; Addison on Torts [4th Eng. ed.], 197, 198; *Ditchett* v. *Spuyten D. & P. M. R. R. Co.*, 67 N. Y. 425; *Swords* v. *Edgar*, 59 id. 28; *Jaffe* v. *Harteau*, 56 id. 398; *Clancy* v. *Byrne*, id. 129, 135; *Ryan* v. *Wilson*, 87 id. 471; *Bard* v. *N. Y. & H. R. R. Co.*, 10 Daly, 520.)

EARL, J. There is an implied warranty upon an executory sale of merchandise that the property is in a merchantable condition, and upon the sale of a chattel by the manufacturer thereof, that the chattel is fit and suitable for the purpose for which it was intended and is purchased, and upon the sale of provisions for consumption, that they are wholesome and proper for use as food; but upon the demise of real estate, there are no such implied warranties. It is a universal rule, to which no exception can be found in any case now regarded as authority, that upon the demise of real estate there is no implied warranty that the property is fit for occupation, or suitable for the use or purpose for which it is hired. The only implied warranty in such case is one for quiet enjoyment. In *Jaffe* v. *Harteau* (56 N. Y. 398) it was held, as stated in the head-note, that "a lessor of buildings, in the absence of fraud or any agreement to that effect, is not liable to the lessee or others lawfully upon the premises for their condition, or that they are tenantable and may be safely and conveniently used for the purposes for which they are apparently intended." Judge GROVER, writing the opinion, said: "There is no reason for

holding the lessor, in the absence of any agreement or fraud, liable to the tenant for the present or future condition of the premises that would not be equally applicable to a similar liability sought to be imposed by a grantee in fee upon his grantor." In *Carson* v. *Godley* (26 Penn. St. 111), WOODWARD, J., said that there was a time when the English courts acted on the principle that it is an implied condition of every lease that the property is reasonably fit for the purpose for which it is let, but that those courts had receded from that rule, and now held that on the demise of land there is no implied obligation on the part of the lessor that it is fit for the purpose for which it is taken, nor in the lease of a house, that it is at the time of the demise, or shall be at the commencement of the term, in a reasonably fit state and condition for habitation ; and he cited for the English rule the case of *Sutton* v. *Temple* (12 M. & W. 52), which is ample authority for what he said. In *Francis* v. *Cockrell* (L. R., 5 Q. B. 501), KELLEY, C. B., said that there was no implied undertaking by the lessor that the demised real estate "shall be reasonably fit, or fit at all, for the purpose for which it is let, that is, for the purpose of habitation. There is really no analogy at all between the case of a lessor and lessee of a house and the case of one who contracts for the supply of a carriage, or for the supply of a seat in a stand upon a race-course, or for the safe passage over a railway bridge. In the case of a lessor and lessee of a house, both parties, before the lease is granted and accepted, ascertain for themselves the condition of the premises, and they then enter into such express covenants as they may think fit for the repair of the premises, or for any other purpose incidental to the enjoyment of the premises." In Thompson on Negligence, 323, the learned author, citing many cases, says that in the absence of fraud or deceit, "there is no implied covenant that the demised premises are fit for occupation or the particular use which the tenant intends to make of them."

Therefore, if any responsibility in this case attaches to the defendant, it cannot be based upon any contract obligation, but must rest entirely upon its *delictum.* If a landlord lets premises and agrees to keep them in repair, and he fails to do so,

in consequence of which any one lawfully upon the premises suffers injury, he is responsible for his own negligence to the party injured. If he demises premises knowing that they are dangerous and unfit for the use for which they are hired, and fails to disclose their condition, he is guilty of negligence which will in many cases impose responsibility upon him. If he creates a nuisance upon his premises, and then demises them, he remains liable for the consequences of the nuisance as the creator thereof, and his tenant is also liable for the continuance of the same nuisance. But where the landlord has created no nuisance, and is guilty of no willful wrong or fraud or culpable negligence, no case can be found imposing any liability upon him for any injury suffered by any person occupying or going upon the premises during the term of the demise; and there is no distinction stated in any authority between cases of a demise of dwelling-houses and of buildings to be used for public purposes. The responsibility of the landlord is the same in all cases. If guilty of negligence or other *delictum* which leads directly to the accident and wrong complained of, he is liable; if not so guilty, no liability attaches to him. If he lets a building for a warehouse, knowing that it is so weak and imperfectly constructed that the floors will break down from the weight necessarily to be placed upon them, his negligence imposes liability upon him for injury to the person or property of any one who may lawfully be upon the premises using them for the purposes for which they were demised. If one builds a house for public amusements or entertainments, and lets it for those purposes, knowing that it is so imperfectly and carelessly built that it is liable to go to pieces in the ordinary use for which it was designed, he is liable to the persons injured through his carelessness. And this rule of responsibility goes far enough for the protection of lessees and of the public generally. It is but a just and reasonable application of the maxim, *sic utere tuo ut alienum non laedas.* It imposes liability upon the landlord for his *delictum*, and the tenant is also liable, not only for his negligence, but also upon the authority of the case of *Francis* v. *Cockrell*, by virtue of an implied contract which he makes with all the persons whom,

for a compensation, he invites or induces to enter his building to witness public entertainments given therein by him or under his supervision. A rule which would place a greater responsibility upon a grantor or upon a landlord while out of possession and deprived of the control of his premises would, as stated in many cases, lead to much injustice, embarrassment and inconvenience. There is no case which holds that the negligence of a landlord is to be inferred simply from the fact that a structure which he lets breaks down. It may break down under such circumstances that the inference of negligence is irresistible and may properly be drawn; but the facts must show that he knew, or had reason to know, that the structure was dangerously weak and imperfect. In *Walden* v. *Finch* (70 Penn. St. 460), in an action for an injury to property caused by the falling of a storehouse, the court said: " The principle appears to be this: that when the owner of a building has done all in his power to erect a safe structure for the purpose for which it is to be used, he is not liable to others for its occult defects. Of course this is to be taken with the qualification that he had no knowledge of the defect, and no reason to lead him to believe the building to be unsafe." In *Carson* v. *Godley* (*supra*), where the action was to recover for damage to property caused by the falling of a storehouse let by the defendant, the court said: " With his eyes wide open to the fact that the government would use his storehouse for heavy storage, he let them have it, knowing that it was unfit for such use, and he inserted no word of caution or restraint in the lease." In *Godley* v. *Hagerty* (20 Penn. St. 387), in an action for a personal injury received from the falling of the same storehouse, it was held that the owner of such a building is liable for injuries sustained by a stranger in consequence of its grossly negligent and insufficient construction. Woodward, J., said: " If after it was finished he (the landlord) knew there were defects in it which unfitted it for the designed purpose, he should have stipulated in his lease against its being used for heavy storage. He omitted his duty in both respects. He did not build a strong storehouse, and he did not forbid heavy storage; he must bear the consequences of his neglect."

In *Robbins* v. *Jones* (15 C. B. [N. S.] 221) it was said by Erle, C. J.: "A landlord who lets a house in a dangerous state is not liable to the tenants, customers or guests for accidents happening during the term; for, fraud apart, there is no law against letting a tumble-down house, and the tenant's remedy is upon his contract, if any." In *Mellen* v. *Morrill* (126 Mass. 545), it was held that the owner of a building leased to a tenant who occupies it is not liable to a person who, in passing along a walk leading from the street to the building, for the purpose of transacting business with the tenant, is injured by falling down an embankment adjoining the walk, although the estate was in that condition prior to the letting. Morton, J., said: "He (the defendant) had leased it to a tenant, and there is nothing to show that he retained any control over the walk, or any right to direct the purposes for which the premises should be used. The fact that the walk was in the same condition before the demise is not material. The defendant did not guarantee that the premises should be safe for all the uses to which the tenant might put them. The tenant alone had the right to determine the purposes for which he would use the premises. If he used them so as impliedly to invite people to visit them in the night, it was his duty to make them safe by a railing, or by a light, or other warning. It was not the duty of the landlord, and indeed he would not have the right without the consent of the tenant, to do this." In *Nelson* v. *Liverpool Brewery Company* (L. R., 2 C. P. D. 311), it was held that the landlord is liable for an injury to a stranger by the defective repair of demised premises only when he has contracted with the tenant to repair, or when he has been guilty of misfeasance, as for instance, in letting the premises in a ruinous condition; in all other cases he is exempt from responsibility for accidents happening to strangers during the tenancy." That was a case where a portion of the building fell from its own weight in consequence of its ruinous condition, causing the injury complained of.

In this case then, under all the authorities, the liability to this plaintiff for the injuries sustained by him from the falling

of the gallery can be imposed upon the defendant only by proving negligence on its part, and the burden of establishing the negligence rests upon the plaintiff.   Now, what are the facts? The defendant owned the premises known as Gilmore's Garden, and rented them to one Kelley for the purpose of giving therein a pedestrian exhibition for the space of ten days, for the rental of $5,000.   It was conceded upon the trial that one of the conditions of the demise was that the tenant might make any and all such changes in the interior of the building, in the appointments and fixtures thereof, as he might see fit at his own expense, on condition that he should surrender the premises at the end of the term in the same state they were in at the beginning thereof.   There was no agreement on the part of the landlord to make any changes or repairs.   In the progress of the trial, subsequently to the concession referred to, which should be taken as true having been made for the purposes of the trial, a portion of a letter written by the defendant to Kelley was produced which specified that any alterations contemplated to the building must first be submitted to the president or vice-president of the defendant for approval, which being obtained, the alterations were to be made and the property restored to its original condition at the expense of the lessee. That clause in the letter, assuming that it was embodied in the lease between the parties, does not alter the effect of the concession, because the lessee was to determine what alterations he chose to make, and then had the right to make them, providing he could obtain the approval of one of the officers named.   It does not appear that the approval of any proposed alteration was applied for or refused.   So the case must be treated as if the tenant had the right to make any changes in the interior arrangements of the premises which he saw fit to make.   The gallery which fell was erected at the westerly end of the building a short time prior to the demise, and was used on several occasions for Mardi Gras and other festivals.   It was divided into boxes capable of holding from four to six persons, and each box was supplied with a table and chairs, and they were intended for occupation by persons who could be served with re-

freshments while witnessing the performances upon the main floor. The persons occupying the boxes during the festival performances were charged a much higher price than those who occupied other portions of the building. The gallery was built under the supervision of an architect, and was suitable for the purposes for which it had been rented and for which it had been used. It was conceded upon the trial that it was built simply to accommodate a limited number, and not to be used for such an exhibition as a walking match; but there was no concession that it was not sufficiently strong to hold all the persons who could get into it, or that the defendant had any knowledge whatever of its weakness or defects. In the absence of proof it must be inferred that the tables and chairs were in the boxes at the time of the demise, and thus that the use for which the gallery was intended was apparent. There is no evidence that the defendant knew that the tables and chairs were to be removed, and that these boxes were to be filled with all the people who could crowd into them. Much less is there any proof that it knew or had reason to suppose that the same price would be charged for all persons entering the gallery as was charged for persons entering other parts of the building, or that the boxes were to be filled with a noisy, boisterous crowd of people, stamping and keeping time to music. There is no evidence and no inference from any evidence in the case, that the defendant knew or had reason to suppose that the gallery would be used in such a way as to endanger its security. Nor was there any proof that any defect in the gallery was apparent or known to the defendant, or that it could have been known by any examination that could have been reasonably expected or required or even made. The architect, called as a witness by the plaintiff, testified that the gallery was perfectly safe for a quiet crowd, but was not when crowded full of boisterous people, moving and stamping to the time of music, which would break down almost any structure. The sole proof by which it is sought to impose negligence upon the defendant is that the gallery, which was thus filled by people thus conducting, fell. There was no proof even that any of the timbers in the gallery

were too small or weak and that they broke, or that they were not properly joined together and supported, or that the gallery was in any respect negligently constructed. The proof is simply that it fell, and the only apparent cause was the rhythmic tramp of the people who filled it, a cause which the landlord certainly was not bound to foresee and guard against. From such a state of things an inference of negligence is not justifiable. There was no proof that the gallery was not built as strong as any of the other galleries in the same building. Kelley, the lessee, knew the purpose for which the building was to be used, and the character of the exhibition which was to be given ; and he could anticipate the crowd of persons who would be called there. He was there and witnessed the manner in which the people conducted themselves ; that they were noisy and bois- terous and walking about, keeping time to the music. He could have placed supports and props under the gallery. That much he could have done, even without the consent of the landlord, as it would have been no alteration of the building. The landlord had no right to enter the building for the pur- pose of making any changes or alterations or to strengthen or support the galleries in any way. That duty rested entirely upon the lessee. I repeat that there is not the least evidence that the defendant knew that the building was unfit for the exhibition of a walking match, the character of which was not generally known and could not be presumed, or that the gallery would be unsafe for the persons who should enter it for the purpose of witnessing that match ; and there can be no pre- tense that the building or the gallery was a nuisance. If it had been shown, or could reasonably be inferred, that the de- fendant knew how this gallery was to be used, and that it was dangerous and unfit for that use, and that it concealed its knowl- edge and did nothing to guard against the danger, no argu- ment would be needed to establish its liability, as that would rest upon obvious principles of law universally applicable.

The case of *Swords* v. *Edgar* (59 N. Y. 28), somewhat relied upon by the counsel for the plaintiff, is one where liability was imposed upon the lessor of a public dock upon the ground that

he had suffered a nuisance in his dock before the demise, and he was held liable on that ground. The decision was made against the dissent of three judges, and after overruling several cases decided in courts of high authority in this country and England, and the ground of nuisance is the only one upon which that decision can stand. There are other similar cases in the New England States and in England. A dock is regarded as a species of public highway, and the owner who suffers a nuisance to be created and continued upon his dock remains liable upon the ground of nuisance. The case of *Camp* v. *Wood* (76 N. Y. 92) does not sustain plaintiff's contention. In that case the landlord was found guilty of negligence for not keeping safe the portion of the building which remained in his possession and under his control. It was held that the lessor owed some duty to the persons who with his knowledge and consent came into his building, and might thus be exposed to the danger which caused the accident. The maxim *sic utere,* *etc.*, is sufficient to justify the decision of that case, which is based upon the same principle which imposes liability upon one who digs a hole upon his premises so near a highway that travelers are exposed to the danger of falling therein and being injured. The case of *Francis* v. *Cockrell* (*supra*) did not involve the liability of a lessor, and the question ·to be determined in this case was not under consideration there. The point decided there was that " a man who causes a building to be erected for viewing a public exhibition and admits persons on payment of money to a seat in the building, impliedly undertakes that due care has been exercised in the erection, and that the building is reasonably fit for the purpose." The liability was placed upon the ground that there was an implied contract between the defendant and his associates, and every person from whom they received an admission fee to the exhibition, and the distinction between the liability of those who gave the exhibition in that case and took pay for admission to the same, and the liability of a landlord during the term of his demise was clearly and properly stated, as shown by the abstract from one of the opinions hereinbefore given. In the

case of *Grote* v. *Chester and Holyhead Railway Company* (2 Exch. 251), the plaintiff suffered injury by the breaking down of the bridge of the defendant, while being carried over the same by another railroad company, and it was held that the defendant was liable. There was no question in that case of landlord and tenant. The defendant had not leased the bridge or its railroad to the other company, but for compensation paid to it, it permitted that company to carry its passengers over its road and over the bridge; and it was held, as it was in the case last cited, that the defendant was under a contract obligation to furnish a reasonably safe bridge, and it was made liable for a breach of the implied contract.

We are, therefore, of opinion that there was nothing in this case for submission to the jury, that the plaintiff was properly nonsuited, and the judgment below should be affirmed.

RUGER, Ch. J. (dissenting.) I differ with the majority of the court in respect to this case, with some reluctance, and should cheerfully yield to their larger experience and maturer judgment, were my own convictions on the subject less strong than they are.

The differences which exist between us relate mainly to the principles of law applicable to the facts; but as we also disagree in some minor particulars as to the meaning and effect of the evidence, I deem it proper first to state those facts, which I consider established, or fairly inferable from the proof.

The plaintiff, having been nonsuited, is of course entitled to the benefit of the most favorable construction of the evidence, and the determination of all doubtful inferences, in his favor upon this appeal.

The case shows that he was injured on the evening of March 12, 1879, by the falling of a gallery, in Gilmore's Garden at New York. He was there as one of the spectators at a public exhibition called the International Walking Match, having paid the regular fee charged for admission to the entertainment. At the time of the accident, he was standing under the gallery

which fell, it being at the time occupied by a portion of the audience. The plaintiff's right to be in the place where he was injured, and his freedom from negligence, are not questioned. The evidence tended to show that the gallery gave way in consequence of vibrations, produced by its occupants in tramping, to keep time to the music, and the insufficient capacity and strength of the structure to support the audience while thus engaged. The plaintiff's right to recover against somebody for the injuries sustained is not disputed, but it is urged that the liability rests upon the lessee, and not upon the owner of the building. The case shows that the defendant, on March 8, 1879, leased the building in question, a spacious structure, apparently capable of accommodating a multitude of people, and covering an entire square in the city of New York, to one Kelley, for ten days, at a rental of $5,000. *The premises were let for the express purpose, of enabling the lessee to give the entertainment, which was being exhibited when the plaintiff received his injuries.* So far as the case shows the building was in the same condition when leased as it was at the time of the accident, with the exception of a track and its railing which was constructed by the lessee for the use of the pedestrians. No provision was made in the lease for repairs by either party, and it appears thereby that any alteration by the tenant of the premises was prohibited, except upon the consent of the lessor first obtained, and upon the condition that they should be restored at the end of the term in the same state as when demised.

At the commencement of the trial it was conceded that the lessee had the right to make changes in the interior of the building, but subsequently the contract itself was produced and this concession was shown to be erroneous. The gallery was built on the westerly side of the building, extending a distance of about one hundred and twenty-four feet, and forming an extension of another gallery, constructed across the end of the building. It was, so far as appears, intended for use by spectators, and the extension was apparently built in the same way and supported in the same manner as the original gallery.

This extension was divided into twenty-four boxes or compartments with a passage-way running along the wall in the rear of the boxes and intended to facilitate access to them. The boxes were originally furnished with movable tables and chairs, and were designed to accommodate from four to six persons each, in witnessing entertainments, and partaking of refreshments, without leaving their seats, during the course of the performance.

It was conceded on the trial that at the time of the accident these tables and chairs had been removed, but by whom, or at what time, does not appear. There is no evidence that Kelley, the lessee, ever saw the chairs and tables, or knew how they were used, and no evidence from which a presumption would arise that he had done so. Even if it be conceded that he did know, it is not conceived how that fact can be material. The defendants certainly could not discharge the duty which they owed to the public, by simply notifying their lessee, that they did not consider the structure *which they expressly let for the exhibition of a walking match,* to be fit for that purpose.

Previous to the walking match this gallery had been used at the Arion and Mardi Gras festivals, by persons having charge of those entertainments, by leasing the boxes to individuals and parties desiring such accommodations, at prices exceeding those charged for admission to other parts of the building. The evidence tended to show that the supports of the gallery would have been sufficient to maintain the people who were admitted to it, on the night of the accident, had it not been for the stamping and boisterousness of the occupants. It was expressly conceded on the trial, by the defendants, that they did not build this gallery *to be used for the purpose of such an exhibition as a walking match,* but that it was intended simply for the accommodation of a limited number of people. It is not claimed *that this intention and design was communicated by the owner to the lessee or to any other person,* or that any provision was inserted in the lease referring to the gallery, but it is contended by the defendant that its division into boxes was sufficient notice to all persons of its limited capacity, and imposed upon them any risk resulting from the admission

thereto, of a greater number of persons than it could safely hold, when it was also occupied by tables and chairs. Even if this circumstance be regarded as material, I do not think that it can be determined as a question of law. Taken in its most favorable aspect for the defendant, it presented a question of fact merely, for consideration by the jury. I do not think that the presence of boxes or compartments, in the gallery of a building intended to be used for public entertainments, necessarily affords notice of the limited strength and capacity of the structure wherein they are placed. It certainly furnishes no positive and definite indication of the number which it is designed to support, and the duty of communicating this information to the public rested primarily, I think, upon those who designed the structure, and knew its limited capacity.

It is, perhaps, true that persons of great caution and prudence might infer from the division of the gallery into boxes, that it was not designed to be filled to its utmost capacity, but to determine from this fact alone just how far it was safe to occupy it, and just when prudence would require access to it to be closed, is a question concerning which, people of varying degrees of intelligence, caution and sagacity might well differ. It must be remembered that this gallery was obviously designed for the use of spectators, and was intended by the lessor to be thrown open for their accommodation at public entertainments. The responsibility of deciding just how many people could safely be admitted to it during the course of an exhibition cannot justly be imposed either upon a temporary lessee or its temporary occupants, whose knowledge of its insecurity could only arise from the inferences which they might draw from the fact of its division into compartments. This question was one peculiarly for the consideration of a jury, and should not have been withdrawn from them.

The degree of liability which rests upon the owner of a building, toward those who sustain injuries therein, on account of defects in its structure, varies according to the use for which it is designed. In order to exempt him from liability in the case of a building let for hire, and designed for public

entertainments, the use for which it is intended should be so obvious from the form of the structure or other causes, that a variation from such use, can easily be distinguished by observers, and convey a clear idea of its restricted capacity. When a structure, however, is let by its owner for a particular public use, for which use he receives a compensation, there is always a warranty implied on his part that it is fit and adapted to the purpose for which it is let. There is generally no implied warranty upon the part of a lessor of dwellings or other private houses and buildings that they are fit and adequate to the purposes for which they are leased. (*Jaffe* v. *Harteau,* 56 N. Y. 398.) But the rule is different with reference to erections in which public exhibitions and entertainments are designed to be given, and for admission to which the lessors either directly or indirectly receive compensation. In such a case the lessor, by renting the premises for such purposes and receiving a compensation therefor, holds out to the public that the structure is fit and safe, for the purposes for which it is let, and owes a duty to those who attend such entertainment, requiring him to use all reasonable precautions to protect them from at least any danger arising from the known imperfections of the structure. (*Swords* v. *Edgar,* 59 N. Y. 34; *Camp* v. *Wood,* 76 id. 92; *Waggoner* v. *Jermaine,* 3 Denio, 306; *Francis* v. *Cockrell,* L. R., 5 Q. B. 184, 501; *Nolton* v. *Western R. R. Co.,* 15 N. Y. 444; *Thomas* v. *Winchester,* 6 id. 397; *Beck* v. *Carter,* 68 id. 283; *Grote* v. *C. & H. R. Co.,* 2 Exch. 251; *Campbell* v. *Portland Sugar Co.,* 62 Me. 552; *Wendell* v. *Baxter,* 12 Gray, 494.)

If a structure adequate in all respects for the purpose for which it is apparently designed be delivered into the possession of a lessee, who is under an obligation to keep it in repair, and while thus in his possession an accident occurs by reason of its want of repair, the liability for damages thereby occasioned doubtless rests upon the tenant alone. (Moak's Underhill on Torts, 258; *Clancy* v. *Byrne,* 56 N. Y. 129; *House* v. *Metcalf,* 27 Conn. 631.) So, too, when the tenant devotes the premises to uses other than those for which they are let,

and injuries occur in consequence of such an unauthorized use, the landlord would for that very reason be shielded from responsibility for the accident. (Moak's Underhill on Torts, 253; *Ryan* v. *Wilson*, 87 N. Y. 471.) But if any part of a structure, designed for occupation by the public, be so constructed that it cannot safely support all whom it has capacity to hold, it is obviously the duty of those authorizing its use by the public and knowing its insecurity, to take such precautions, either by giving notice, or limiting the number admitted, as will obviate any danger likely to arise from such defects. (*Beck* v. *Carter*, 68 N. Y. 283.) In such a case the burden of proof rests upon the lessor to rebut the presumption of negligence, arising from the facts, by affirmative evidence showing the adoption of reasonable precautions to avoid accident. (*Mullen* v. *St. John*, 57 N. Y. 567.)

I think it entirely immaterial to inquire whether the person injured in this case had a right of action against the lessee, since in actions of tort all of the persons contributing to the injury are liable for the damages occasioned thereby. It is sufficient here, to say that there was evidence upon which the jury might have found a breach of duty, on the part of the defendant, owing to the plaintiff, and from an omission to perform which he incurred injuries.

The theory now suggested, that the owner of a building designed to be let for the use of public entertainments has, upon letting the same to a temporary occupant, thereby imposed upon such occupant, and relieved himself from, all liability to persons lawfully attending an exhibition therein, and receiving injuries through defects in its original structure, is a startling one, and is so opposed to what I believe to be settled law that I am unable to assent to it.

The principles upon which such owners have been held liable to the public, visiting their premises and receiving injuries thereon, through defects in their construction, have been frequently discussed and adjudged in the courts, in the cases cited as well as others, and a proper regard for the authorities, not only in our own court, but in those of other States and coun-

tries, seems to me to require the reversal of the judgment appealed from. This liability springs out of the obligation resting upon them to so guard their property, that persons entering upon it by their permission or invitation shall not be injured through any omission of theirs to take all reasonable and prudent precautions to insure the safety of such persons; and this liability becomes more imperative when the owner derives an income from such use of the property. I have supposed that it was an incontrovertible principle of law, when in the exercise of any business or calling, by whomsoever exercised or however carried on, which involves the safety, health or lives of the public, that the person pursuing such calling or business is held to the exercise of the highest degree of care in the prosecution thereof. Illustrations of this principle are found in the cases, relating to the compounder of drugs and medicines, the builder of houses or structures abutting upon streets or public highways, carriers of passengers, and manufacturers of tools or instruments to be used in a hazardous business. This liability does not rest upon the theory of an express contract, between the owner and the person receiving the injuries, but is predicated upon the obligation which the law imposes upon all, to so keep and use their property that others using or entering upon it by their invitation, shall not be injured by its improper condition or unfitness, and its inadequacy for the purpose to which it has been devoted.

Whether it be said that the circumstances raise an implied warranty upon the part of such owner toward those accepting his invitation, or impose a duty upon him with respect to the safety of the public, I regard as entirely immaterial. The natures of the respective obligations seem to be similar and possibly are identical, but either in one form or the other, the liability of the owner seems to have been adjudicated in many cases. When the plaintiff has given evidence tending to show an omission, upon the part of the owners, to perform their duty, he has established a case sufficient to go to the jury, and if there are any circumstances, tending to excuse the apparent neglect of the owner, it is for him to show them.

Here the facts are expressly admitted that the owner, *knowing the unfitness of the premises for the purpose, let them to be used for a walking match,* and the accident occurred in consequence of their unfitness for the purpose. This apparently made a good *prima facie* case for the plaintiff under the authorities, and should have compelled the defendant to enter upon its defense.

I have been unable to see any material distinction between this case and that of *Swords* v. *Edgar.* The defendants in that case were the owners of a pier, kept for the accommodation of vessels receiving and discharging cargoes in the port of New York, and was leased by them to a steamship company from May 1, 1865, for a period of five years with a covenant from the lessees, to keep it in order and repair during the term. The pier was defective at the time it was let, and fell from that cause, while in the possession of the lessees on May 9, 1866, killing the plaintiff's intestate, who was then engaged, in unloading a cargo, from a vessel lawfully lying at the pier. There was evidence tending to show that the pier was too heavily loaded, at the time of the accident. It was held that the lessors were liable for the damage occasioned by its imperfections. It was said by Judge FOLGER in that case " that the defendants demised the premises to other parties, binding them in a covenant, to keep the pier in good order and repair. The defendants were not in possession of the premises at the time of the accident. It is claimed that thereby the defendants are under no liability to the plaintiff. We have shown that this pier, so far as the intestate was concerned, was in the nature of a public place whereon he was lawfully engaged. We have shown that it was of such a nature that there was, as to him, a duty resting somewhere to keep this pier in a reasonably sound and secure condition." The learned judge, then continuing, says that primarily this duty rested upon the occupants of the pier, but further says that there may be a state of facts which will also cast a liability upon the lessors, and proceeds as follows : " When there has been a nuisance of continued existence upon demised premises, the lessor and lessee may both be liable for damages resulting

therefrom. The lessee in the actual occupation of the premises, if he continues the nuisance after notice of its existence and request to abate it, and the lessor, if he first created it and then demised the premises with the nuisance upon them, and at the time of the damage resulting therefrom, is receiving a benefit therefrom by way of rent or otherwise." It was also held that proof of misuse of the structure by the tenant in overloading it did not in that case relieve the lessors from liability. It has been said that this case is inapplicable to the one in hand because it proceeds upon the ground that the defect therein complained of constituted a nuisance, and that such an element is wanting in this case. It is not seen, however, wherein a defect in the structure of a pier, designed for the use of that class of the public engaged in commercial pursuits only, can be called a nuisance, and a similar defect in a church, theatre or other place of public amusement, which the public generally are invited to use, can be fittingly described by any other term. That case was in many important respects, and particularly in relation to the restricted class entitled to use the pier, the covenant to repair assumed by the lessee, the lapse of time after the letting, and the combination of natural decay with the original defect in construction producing the accident, a much stronger case for the defendant than the one now under consideration. Neither do I think the case of *Camp* v. *Wood* can be distinguished from this by any material circumstances. There the action was against an innkeeper who had let to others for a compensation, a hall in the third story of his house for the purpose of enabling them to give a dancing entertainment, to which all persons were invited who were willing to pay the admission fee charged therefor. The plaintiff had paid his fee, and was injured by falling from a doorway, in the second story of the house, which it was charged had been negligently left open or unlocked by the owner. It was said by Judge ANDREWS in delivering the opinion of the court: "It is insisted that he (the defendant) owed no duty to the plaintiff which imposed upon him any obligation to make the premises safe, and to see, so far as he reasonably could, that the door was kept closed so as to prevent

accident.   This claim cannot, we think, be maintained.   He let
the premises for hire, and it is admitted by the pleadings that
the public were invited to the hall with his consent and knowl-
edge, whenever it was let for a public purpose.   The plaintiff
was rightfully there upon the invitation of the managers of the
entertainment implied from the public character of the assem-
bly, their accepting the entrance fee paid, and his admission to
the hall."   " In this case the defendant, by letting the hall for
public purposes, held out to the public that the hall was safe,
and he was bound to exercise care to provide safe arrangements
for the entrance and departure of people who came there upon
his invitation."   The main difference in these cases seems to be
that here, the defect existed in that part of the structure which
was specifically let for a walking match, and in that, to a part
of the structure which was not let, and as to which no contract
could be implied, except one arising out of a duty imposed.

It could hardly be contended that such a difference favors
the contention of the defendant here.   The case of *Fran-
cis* v. *Cockrell* is a leading case in England and was thoroughly
and exhaustively considered both by the Queen's Bench and in
the Exchequer Chamber.   The head-note of the report in the
Exchequer Chamber reads as follows : " A man who causes a
building to be erected for viewing a public exhibition, and ad-
mits persons on payment of money to a seat in the building,
impliedly undertakes that due care has been exercised in the
erection and that the building is reasonably fit for the purpose,
and it is immaterial whether the money is to be appropriated to
his own use or not."   Referring to the case of *Grote* v. *Chester &
Holyhead Railway Co.* ( 2 Exch. 251), which was an action by a
passenger, on the Shrewsbury and Chester railroad, to recover
damages for injuries received in consequence of the falling of a
bridge, built by another railway company, and leased by
them to the company upon whose cars, the plaintiff was rid-
ing when the accident occurred, Chief Baron KELLY says : " The
question was whether the defendants who had caused the bridge
to be constructed by an engineer with whom they had
entered into a contract, had not entered into an implied con-

tract with everybody who had occasion lawfully to make use
of the bridge and pass over that bridge, that it was reasonably
fit for the purpose for which it was to be applied; that is, that
it was safe and secure against ordinary risks and dangers for
any one to pass over it.   It was held that the defendants had
entered into such an implied contract and they were held liable
for the consequences of the defect."   This extract is preceded
by the remark, " I cannot understand upon what imaginable
ground it is to be supposed that there is not such an implied
undertaking in every contract of this description."   He further
says : "First, there is the principle which I hold to be well
established by all the authorities that one who lets for hire, or
engages for the supply of any article or thing, whether it be a
carriage to be ridden in, or a bridge to be passed over, or a
stand from which to view a steeple chase, or a place to be sat
in by anybody who is to witness a spectacle for a pecuniary
consideration, does warrant and does impliedly contract that the
article or thing is reasonably fit for the purpose to which it is
to be applied."   Baron MARTIN in the same case says : " I do
not at all pretend to say whether the relation of the parties
raised a contract, or a duty.   It seems to me exactly the same
thing; but I am of opinion when a man has erected a stand of
this kind for profit, that he contracts impliedly with each indi-
vidual who enters there and pays money to him for the en-
trance to it, that it is reasonably fit and proper for the purpose,
or if you choose to put it in another form, that it is the duty
of the person who so holds out a building of this sort, to have
it in a fit and proper state for the safe reception of the persons
who are admitted."   It may be said with reference to this case
that it is to be distinguished from the case at bar, from the fact
that there the defendant was one of a committee, who received
directly the moneys paid for entrance by the spectators, although
they acquired no interest therein, inasmuch as they were de-
voted by the committee to the use of the public in expenses
for prizes, and other charges incurred in supporting the races.
But that case was decided irrespective of any such distinction
and the *Grote Case* was expressly approved by most of the six

judges delivering opinions.    Analogous authorities on this subject will readily recur to the mind of every lawyer, and might be almost indefinitely cited; but sufficient have already been referred to, to explain the reasons, which have controlled my judgment in the consideration of this case.    My opinion of the case rests upon the undisputed facts, that the defendants let Gilmore's Garden for a walking match, a purpose for which they admitted it was not designed, and *knowing its unfitness for that purpose*, took no precautions other than those derivable from its general appearance, to warn either their lessee or the public, of its want of fitness for such a purpose.    The building was used by the lessees only for the purpose for which it was specifically let, and if there was any part of it, not adapted to such a use, it was the duty of the lessor to adopt effectual means, to permit only such a use as was consistent with the safety of those attending the entertainment.    It cannot be held, I think, as matter of law upon the proof in the case that the defendants discharged the duty which they owed to the people, who visited it to the lessor's profit and by their consent, authority and invitation.

RAPALLO, ANDREWS and MILLER, JJ., concur with EARL, J.

DANFORTH and FINCH, JJ., concur with RUGER, Ch. J.

Judgment affirmed.