tion on the right to bring the action originally; but in suits in equity the court may, on account of unnecessary and prejudicial laches, deny the motion, even when made within 10 years. Pringle v. Railroad Co., supra; Mason v. Sanford, supra. In the case at bar, however, the main issues have already been tried, and facts found upon which the court has decreed by interlocutory judgment that the plaintiff is entitled to an accounting for the purpose of carrying into effect the partition agreement. The decree for an accounting distinguishes this case from those cited. When, as here, there has been interlocutory decree for an accounting, the 10-year statute of limitations does not bar revivor, and in such case the granting of the motion is discretionary, but it will be denied for gross laches or negligence. Hollingshead's Case, 1 P. Wms. 742, cited with seeming approval in Coit v. Campbell, supra; Alsop v. Bell, 24 Beav. 451; Curtis v. Sheffield (1882) 20 Ch. Div. 398, 18 Enc. Pl. & Prac. pp. 1106, 1107; Earl of Egremont v. Hamilton, 1 Ball & B. 516; 2 Barb. Ch. Prac. p. 53; 2 Daniell, Ch. Prac. (6th Am. Ed.) p. 1543. In this case, as has been observed, no prejudice has been shown. The original parties, who have died, had been examined before the referee. It does not appear that their examination was not full and complete. Their testimony having been preserved, the substituted parties will have the benefit thereof. It is not shown that any mutual voucher, book of account, record, or other evidence has been lost to the appellants by the delay. Prejudice would more likely result from denial of revivor, for it is not apparent that this testimony would be as available in any other action or proceeding. The various other litigations in which the parties engaged explain the suspension of activity on the reference herein. Upon the transfer by the defendant of his interest in the property to Morgan Jones, the latter became the real party in interest in the defense of the case. That he so considered it is shown by his answer in the ejectment suit, wherein he pleaded the pendency of this action as a bar. The parties in interest and the court have regarded this action as pending. Ten years have not elapsed since the death of the plaintiff or of Morgan Jones, the real defendant. If the order could not be sustained upon that ground alone, upon the theory that equity will disregard the form and look at the essence of things, these facts tend to justify the exercise of the court's discretion in granting the motion.

For these reasons, the order should be affirmed, with $10 costs and disbursements. All concur, except VAN BRUNT, P. J., who dissents.

---

(68 App. Div. 601.)

### BARRETT v. LAKE ONTARIO BEACH IMP. CO.

(Supreme Court, Appellate Division, Fourth Department. January 28, 1902.)

1. NEGLIGENCE—TOBOGGAN SLIDE—PLATFORM—RAILINGS—SUFFICIENCY.

Plaintiff's intestate fell from the platform of a toboggan slide, some 25 feet in height, and was killed. The platform was 11 feet square, and was protected by a railing 4 feet in height. The spaces between the middle rail and the floor of the platform and between it and the top rail were each 21 inches. Intestate had mounted a step on the platform in order to place his toboggan on the slide, when he in some manner

slipped or fell through the railing to the ground beneath. There was evidence that the walk leading to the platform and the platform itself sometimes would become wet, and that at least one person had slipped on the walk, but it did not appear that the platform was wet on the day in question, or that any one had ever slipped or been injured on the platform, though it had been used for five years. *Held* insufficient to show a want of reasonable care on the part of defendants in the construction of the railing, and that a verdict for plaintiff should have been set aside.

2. SAME—CONTRIBUTORY NEGLIGENCE—OBVIOUS RISK.

Intestate was a bright active boy 15 years old, and had already earned money for himself. He had been on the slide for some two hours before the accident occurred. *Held* that, even if the railing was insufficient, the defect was open and visible, and defendant could not be held liable.

Williams and Spring, JJ., dissenting.

Appeal from Monroe county court.

Action by Patrick Barrett, as administrator of Thomas Barrett, deceased, against the Lake Ontario Beach Improvement Company. Verdict for plaintiff, and from an order refusing to set the same aside defendant appeals. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and HISCOCK, JJ.

George F. Yoeman, for appellant.
James B. Perkins, for respondent.

HISCOCK, J. This action was brought to recover damages for the death of plaintiff's intestate, who was killed by falling from the platform of a toboggan slide, and which is claimed to have been negligently constructed, in that it did not have a sufficient railing or guard around it. The premises where the accident occurred consisted of a portion of the beach at Charlotte, in Monroe county, a bath house and appurtenances, and the toboggan slide in question. The accident occurred during the afternoon of August 26, 1900. The premises, including the structure in question, were owned by the defendant, but at and for a considerable period before the date of the accident were leased to and in the possession of one Briggs. The intestate fell from the platform of the toboggan slide, which was elevated about 25½ feet above the beach. The construction of this slide and platform, so far as material here, was as follows: The platform from which the slide led into the lake was supported by a framework made of sills and posts strengthened by cross braces. It was 11 feet and 2 inches square, made of planks about 10 inches wide, planed on the upper surface, and laid about seven-eighths of an inch apart. It was protected by a railing 4 feet in height, which consisted of posts made of 4x4 scantlings, set at the corners of the platform, and halfway between the corners, and upon the top of which, and midway between the top and the floor, were rails made of 2x4 scantlings. The spaces between the middle rail and the floor of the platform and between it and the top rail were each 21 inches. It will thus be seen that this railing about the platform reached to the breast of a man of average height, and that the opening between the floor and the platform and the middle of the lower

rail would not quite reach to his knee. The slide for the toboggan led from this platform by a reasonably steep decline into the waters of the lake, and consisted of a trough-like structure, in the bottom of which the toboggan ran. On the west side of this trough was a smooth surface, which was used as a walk for returning from the water to the platform. Access to the platform was also furnished by a stairway leading onto the south side of the platform. The slide was elevated somewhat above the north edge of the platform, and the portion of it forming the trough projected over it towards the center. This projecting portion was used to place the toboggan upon before mounting, and from it the start was made down to the water. At the west side of this projection, and at the north edge of the platform where the walk from the water terminated, a step was placed about 10 inches high and 10 inches wide, reaching from the edge of the portion of the slide used for mounting to the west railing, a distance of about 2½ feet. The main structure was rebuilt in the spring of 1896, and, at least so far as the platform and railing were concerned, was used without material change during the seasons elapsing down to the time of the accident. There was evidence showing that, in consequence of people coming out of the water, the walk from the water to the platform would become wet, and that at least one person had slipped upon it. The platform itself was at times damp, when many people came out of the water upon it. There was no evidence, however, that any person had ever slipped upon it, or that any accident had ever happened upon or from it, but the one in question. There was no evidence that the platform was wet or slippery upon the day in question. The proof, upon the other hand, was that the day was very hot, and the sun shining with such brightness and heat as would rapidly dry up any moisture.

There is no definite or very satisfactory evidence as to the exact manner in which the fall of the intestate, which finally took him over the edge of the platform to the ground and caused his death, commenced. He had been down the slide into the water, and had returned, with his toboggan, to the platform. He had mounted upon the step for the purpose of placing the latter on the slide, when in some manner he slipped or lost his balance and fell. Only two witnesses saw him in the first portion of his fall.

The witness Brazil says:

"He was ready to go down, and he had the sled in his hands, and he set it on the toboggan, and the stool they step on shook with him, and he slipped and went through between the rail and the floor."

Upon cross-examination, however, he materially qualifies this evidence, saying:

"I do not know exactly what he was doing when he fell off. I saw him put his sled down, but I do not know whether he was to jump on the sled or not. * * * I did not see his feet before I saw him go through the railing. * * * I do not know what he was doing just before he came through the railing. * * * I could not tell from where I was whether he slipped or whether it was something else. I saw him go, and that is all I can tell."

The witness Lincoln says:

"I was looking right at him, and the first thing I knew he fell. I wouldn't
say whether he went over or under, he went so quick. * * * When I saw
him on the platform he was about in the center of it,—the center of the
west side. * * * He was just standing with his back to the railing, two
or three on each side of him."

Three fundamental questions were involved and considered upon
the trial below, as likewise they have been argued here. These ques-
tions relate to the safety and sufficiency of the construction of the
toboggan slide, the assumption of any risks incidental to its con-
struction by the intestate, and the liability of the defendant for the
negligence, if any, in the construction, it being a lessor, and not in
possession of the property at the time of the accident. In view of
the conclusions which we have reached upon the first two ques-
tions adverse to the claims of the plaintiff herein, we shall not
deem it necessary to consider the last one.

It may be admitted that the question whether there was evidence
to sustain the jury's verdict of negligence in the construction of the
platform and the railing thereon is not entirely free from doubt.
It, of course, would have been a simple and inexpensive matter to
have put one or even more additional railings around the platform,
and to have thus made impossible an accident such as happened. It
also would be very easy to say, in the light of the unfortunate oc-
currence which did happen, that it would have been well to have
done this. This, however, is not the method by which we are to
determine this question. We are rather to say whether before this
accident happened there was anything which should have led the
person responsible for the structure, in the exercise of ordinary care
and caution and thoughtfulness, to apprehend that there was a
probability of its happening. As was said in Crafter v. Railway
Co., L. R. 1 C. P. 300, and quoted with approval in Larkin v.
O'Neill, 119 N. Y. 221–225, 23 N. E. 563, 564:

"A line must be drawn in these cases between suggestions and possible
precautions, and evidence of actual negligence such as ought reasonably and
properly to be left to a jury. It is difficult in some cases to determine where
the line is to be drawn."

Under all of the circumstances of this case, we think that it stands
upon that side of the line marked by lack of evidence, upon which a
jury might predicate and find negligence. In considering this ques-
tion, it is proper to keep in mind, as affording some light for its de-
cision, the character and purpose of the structure. It was there
simply and solely for purposes of amusement. No one was com-
pelled by necessity, or even business purposes, to visit it. Moreover,
the amusement, for the enjoyment of which it was a necessary means
and instrument, was dependent for its attractiveness upon a certain
amount of exhilarating excitement. The main feature of the plat-
form which made possible intestate's death—its elevation from the
ground—was absolutely necessary and essential to secure the at-
tractive sport of running rapidly over the slide down into the water.
In this respect the structure was somewhat different in the character
of the invitation which it held out to the public from a hotel, where

one could go seeking simply rest and security, or from a theater, which one would attend without any thought of risk or excitement incidental to the nature of the building.

First impressions about the safety and sufficiency of the railing around this platform might differ. Some person, especially if unable to entirely free his mind from remembrance of the fact that somebody had slipped through the railing, might reason that a space of 21 inches between railings was liable to offer an opportunity for such an accident. The space of 21 inches, however, between the middle railing and the platform on one side and the top railing upon the other, was comparatively small. The lower space would not come to a man's knee. It is not claimed that a person standing in any ordinary attitude was liable to go over or through it. It was only in case of an unnatural attitude, caused by slipping or falling, that such an accident could happen, and we do not believe that a combination of circumstances which would result in a person being passed through this railing without catching it or being stopped by it was reasonably to be apprehended.

Passing by original reasoning upon the subject, however, we have what seems to us a more reliable and accurate test by which to measure the sufficiency of this structure, and that is the history and result of its actual use. It had been used for the same purposes which it was called to serve at the time of the accident for nearly five years. During that time thousands of people had used the platform as intestate was using it when he met with his death. Sometimes upon a single day the number of its patrons would reach from 100 to 150. During that time not only had no one fallen over or through the railing, but, so far as the evidence discloses, no one, by slipping or otherwise, had been placed in such a position of peril as to require the use of the railing to keep him from falling over. There was nothing about the use of the platform calculated to so hurry or distract the attention of a person using it as to lead him into risk or peril. As we have stated, it would only be some unusual condition which would throw a person upon or against this railing for protection. This was true in the case of intestate's accident, and the evidence does not clearly indicate just what that condition was, or whether it was such as to free intestate from any imputation of negligence, and allow plaintiff to claim some dereliction upon the part of defendant or its lessee. According to the evidence of one witness, we have the intestate standing at the mouth of the toboggan slide, apparently getting ready to go down it, and the next instant going through the railing. We must largely rely upon conjecture if we say that the commencement of this fall was due to his slipping upon boards which were rendered slippery by dampness incident to the use of the toboggan, as claimed by plaintiff. So far as the evidence discloses to our minds, it would be quite as easy to conclude that he stumbled or lost his balance in placing his sled, and as the result of such an unusual and unforeseen mishap was thrown into the fall which resulted in his death; that the accident was the result of a mishap which was not reasonably to be apprehended in building the platform and railing.

74 N.Y.S.—20

In Larkin v. O'Neill, 119 N. Y. 221, 23 N. E. 563, plaintiff fell upon the stairway in defendant's store. The steps were used by a great number of people, and it was claimed that they were negligently constructed, in that there were no footholds, brass plates, or rubber pads thereon to keep one from slipping. The court, referring to the fact that these steps had been used daily in safety by a great number of people who passed up and down, say, with reference to plaintiff's accident:

"There is nothing in the manner in which the stairs were constructed, used, or kept from which such a result could reasonably be anticipated. It is quite probable that the accident occurred from slipping or from a misstep by the plaintiff."

In Hart v. Grennell, 122 N. Y. 371, 25 N. E. 354, where it was held that defendant was not liable because plaintiff had tripped and fallen over a truck handle in the latter's store, it was said that the rule of liability in such a case "has reference to such dangers as might reasonably be anticipated by a prudent and careful man. * * * The question is, could the mischief have been reasonably foreseen?"

In Burke v. Witherbee, 98 N. Y. 562, the accident was caused by the slipping of the hook from the bail of a car which was used in defendant's mine. The plaintiff claimed that there should have been a bolt through the hook, and there was no question that such an appliance could have been easily used and would have prevented the accident. The car had been used, however, for a long time safely, and without any such accident. In speaking of this test by actual experience, the court say:

"What more could any reasonable or prudent man have to justify him in believing that this convenient appliance was also a safe and proper one? What greater or different tests could it have been subjected to before a mine owner could use it without the imputation of negligence?"

In Dougan v. Transportation Co., 56 N. Y. 1, the deceased was attempting to secure his hat, which had blown off, and in so doing he slipped, and went through one of the openings in the rail of defendant's boat, and was drowned. There was proof that the boat had run in the same condition for a long time, and that the same situation existed upon other boats, and that no accident had occurred before. The court said: "Had there been proof tending to show that any such danger would be apprehended by a reasonably prudent person, the evidence should have been submitted to the jury." But it held that, in the light of the experiences had with the boat, there was no such evidence.

In Loftus v. Ferry Co., 84 N. Y. 455, 38 Am. Rep. 533, the plaintiff's intestate, a child six years old, while passing from the ferry boat to the dock, fell through an opening 22 inches high between the bottom and second rail of the float or bridge over which passengers passed in going upon or leaving the boat. The proof was that this bridge had been in service five or six years, was similar to bridges of other ferries, and that no similar accident had previously happened. In holding that there was no proof of negligence upon the part of the defendant, the court say:

"The rule does not impose upon the defendant the duty of so providing for the safety of passengers that they shall encounter no possible danger, and meet with no casualty, in the use of the appliances provided by it. It was possible for the defendant so to have constructed the guard that such an accident as this could not have happened, and this, so far as appears, could have been done without unreasonable expense or trouble. If the defendant ought to have foreseen that such an accident might happen, or if such an accident could reasonably have been anticipated, the omission to provide against it would be actionable negligence. But the facts rebut any inference of negligence on this ground. The company had the experience of years, certifying to the sufficiency of the guard. That it was possible for a child, or even a man, to get through the opening was apparent enough. But that this was likely to occur was negatived by the fact that multitudes of persons had passed over the bridge without the occurrence of such a casualty."

See, also, Lafflin v. Railroad Co., 106 N. Y. 136, 12 N. E. 599, 60 Am. Rep. 433; Craighead v. Railroad Co., 123 N. Y. 391, 25 N. E. 387.

Within the rules laid down by, and the reasoning of, these and other cases, and in view of the fact that it had safely and securely served all of the purposes for which it was designed for years, we think it was improper to permit a jury to say that this platform and railing was not constructed with reasonable care and that it was not sufficient to guard against any contingencies which could be reasonably apprehended.

We think this case can clearly be distinguished from that of Donnelly v. City of Rochester, 166 N. Y. 315, 59 N. E. 989, especially relied upon by plaintiff. There the railing complained of was 2½ feet high, and was the only guard to an excavation which extended into the busy portion of one of Rochester's main streets. The person injured met with his accident, not while voluntarily seeking out a place of amusement, but while necessarily, or at least properly, upon the street. The railing did not comply with an ordinance adopted by the city of Rochester, and thus at the outset a presumption of negligence arose. Then again, in answer to the claim of the defendant that the railing had stood in the same condition for years, with a great number of people passing by, it was shown that other accidents had happened at nearly the same point.

If, however, we should assume that this railing not only might have been, but should have been, more safely constructed, still its defects were open and visible to the most casual glance. The intestate was 15 years old, and, as the counsel for plaintiff states in his brief, "was a promising boy, bright and active. He had already done some work, for which he was well paid, the proceeds of which he gave to his family." He could foresee, and just as accurately determine, the risks incident to the use of this structure as the owner or lessee thereof. If, as claimed by plaintiff, he slipped upon the wet boards, we think that such a contingency was just as much open to and within the limits of his intelligence and experience as within that of the manager or proprietor of the slide. A bright boy of the age in question would have quite as much knowledge upon the question of sliding or slipping as an adult. So, also, he would appreciate as well as the latter the possibility of falling or slipping between the spaces of the railing. The evidence does not disclose

whether he had been upon the slide before the day in question. But upon that day, at least, he had been there for two hours before he met with his accident, and thus had had the most ample opportunity to observe what were perfectly patent conditions. We think, under such circumstances, that plaintiff could not hold defendant responsible for the accident, even if otherwise liable.

Some of the cases to which we have already referred, like that of Larkin v. O'Neill and Hart v. Grennell, in holding the defendant not liable, especially refer to the fact that the person injured "was not exposed to any unreasonable or concealed danger; that the conditions complained of were obvious to every one as to risks, and were well known to the plaintiff;" and that the defendant did not expose any one "to hidden or unforeseen danger."

We think also that, within the rule laid down in Koehler v. Manufacturing Co., 12 App. Div. 50, 42 N. Y. Supp. 182, 1105; Hickey v. Taaffe, 105 N. Y. 26, 12 N. E. 286, and Buckley v. Manufacturing Co., 113 N. Y. 540, 21 N. E. 717, it is proper to hold that the intestate, although an infant, was to be charged with knowledge of the construction which was open to his view, and of the risks which were incident thereto, and to the use of the platform. As stated before, the conclusions reached upon these questions lead us to the belief that the order appealed from should be reversed, without considering the question of defendant's liability as a lessor.

Order reversed, and new trial granted, with costs to appellant to abide event, upon questions of law only, the facts having been examined, and no error found therein.

ADAMS, P. J., and McLENNAN, J., concur.

WILLIAMS, J. (dissenting). Defendant's exceptions should be overruled, motion for a new trial denied, and judgment ordered for plaintiff upon the verdict, with costs.

The action was brought to recover damages for the death of the plaintiff's intestate, alleged to have been caused by the negligence of the defendant. The deceased was a boy 15 years of age, and was killed by falling from a toboggan slide upon the shore of Lake Ontario, at Charlotte, Monroe county. The platform was 25½ feet from the ground, and 11 feet square, and the flooring was of plank, and had a railing around it 4 feet high. The railing was supported by posts at each corner and the middle of each side. Upon the top of these posts was a rail, and halfway between the upper rail and the floor was another rail. The space between the lower rail and the floor was 1 foot and 9 inches. The toboggan slide extended from this platform to the water below, on a gradual decline, and by its side was a smooth walk for returning from the water to the platfrom. The slide extended over and above the edge of the platform, towards its center, and terminated in a small platform about 2½ feet above the main platform. There was a step from the main platform at the end of the inclined walk about 10 inches in height up towards the small upper platform. In order to

make a start down the slide, a person placed the sled upon the small upper platform, went up the step, seated himself upon the sled, and started. The slide was used by a great many persons, sometimes as many as 100 to 150 per day. When in use, the inclined walk and the main platform were wet, and at times slippery, and there was evidence tending to show that the platform was wet and slippery at the time of the accident in question. The accident occurred about half past 5 o'clock in the afternoon of August 26, 1900. Deceased took his sled, stepped upon the step, and placed his sled upon the slide platform. At that moment his feet went out from under him, he shot back, feet foremost, between the floor of the main platform and the lower rail thereof, and, falling to the ground below, was killed.

The first objection to a recovery in the case is that the defendant was not liable because the toboggan slide was not in its possession or under its control when the accident occurred, but was in the possession and under the control of its lessee. The property leased consisted of a bath house, a portion of the beach, and other appurtenances to a bathing establishment, including the toboggan slide. The whole was inclosed by a fence, so that there was no access to them except through the bath house, where a fee was charged to patrons. The property was owned by the defendant, but was in the possession of a lessee, under a lease for a term commencing May 4, 1900, and terminating November 4th of that year. The rent for the term was $400,—a sum fixed by the lease, and payable at specific times. The defendant in no way shared in the profits realized by the lessee from the carrying on of the business, except in the receipt of the rent under the lease. The lease, among other things, provided that the defendant should be permitted to enter the premises at any time for the purpose of examining the same, and of doing any act which might be necessary for the care and preservation of the property; that the lessee would use the premises for a bath house and barber shop, and for no other business; that the lessee would during the term of the lease, at his own expense, make all necessary repairs upon the premises, and would indemnify and save defendant harmless from all claims, costs, and damage by reason of accident or injury to the agents, servants, employés, or guests of the lessee or other persons happening on the premises during the continuance of the lease, by reason of the negligence of the lessee, his agents or servants, or otherwise. (The latter provision of the lease, as contained in the record, is somewhat mixed in the use of the terms "party of the first part" and "party of the second part," but apparently its meaning is correctly stated here.) This property was owned by the defendant as far back as 1894, and was leased to the same lessee for the same purpose every season, from and including that year, until the time of this accident. The old toboggan slide was torn down, and the present one built, in the spring of 1896, and the platform has remained unchanged since that time. When the change was made in 1896 the defendant furnished the materials, and the lessee furnished the labor, and built the structure according to his own wishes,

with the approval of the defendant as to the plan of construction. This platform was used during all the years from 1896 to 1900, both inclusive, for the purpose of the toboggan slide, was frequented by large numbers of persons, sometimes 100 to 150 a day, and no accident ever occurred before this one.

Under these circumstances, the question is whether the defendant, the lessor of the premises, can be held liable for damages for the death of the plaintiff's intestate. There seems to be no doubt but that the general rule is that an owner of property is not liable for damages occasioned by its unsafe condition while leased to and occupied by a tenant. There are, of course, exceptions to this general rule, but defendant's counsel claims this case is not within any of the exceptions. Plaintiff's counsel claims there are exceptions to the general rule which do cover this case. This action is based upon a negligent construction of the platform, in that there was not a third rail around the same between the lower rail and the floor, and the leasing and use of it in that condition. The complaint does not allege that the platform, constructed as it was, constituted a nuisance, and it can hardly be regarded as a nuisance. It was not a public nuisance, because it was upon private property, and it was not a private nuisance, because it in no way interfered with the rights or property of others. In Beck v. Carter, 68 N. Y. 283, 23 Am. Rep. 175, an excavation upon defendant's land, left unguarded, so near the highway as to render traveling thereon dangerous, was held a private nuisance. In Timlin v. Oil Co., 126 N. Y. 514, 27 N. E. 786, 22 Am. St. Rep. 845, the wall of a building on defendant's land adjoining the lands of a railroad company, which was so out of repair that it fell upon the railroad tracks and killed a trackman, was held a private nuisance. In Clancy v. Byrne, 56 N. Y. 129, 15 Am. Rep. 391, and Swords v. Edgar, 59 N. Y. 28, 17 Am. Rep. 295, defective piers owned by the defendants were held to be nuisances by reason of the nature of their use for public purposes in the nature of highways. The court in Edwards v. Railroad Co., 98 N. Y. 255, 50 Am. Rep. 659, said of the latter case that the ground of nuisance was the only one on which it could rest, that there were other similar cases in the New England States, and in England that a dock was regarded as a species of public highway. In the Edwards' Case, just referred to, it was held that a gallery in a building used for a public exhibition, which was so insecurely constructed that it fell during the exhibition, was not a private nuisance. And in Sterger v. Van Sicklen, 132 N. Y. 499, 30 N. E. 987, 16 L. R. A. 640, 28 Am. St. Rep. 594, it was held that decayed and broken steps from the ground to the steps of a dwelling house were not a private nuisance. In Fox v. Buffalo Park, 21 App. Div. 321, 47 N. Y. Supp. 788, the court did not hold that the grand stand, so defectively constructed that a portion of it fell, was a private nuisance, and it could hardly do so in the face of the cases above referred to.

It cannot be doubted that the owner of property who leases the same, with a nuisance existing thereon, is liable for any injuries occasioned by the nuisance during the term of the lease; but that

principle is not applicable to this case, because the defective condition here did not constitute a nuisance, and the case was not submitted to the jury upon any such theory. It was submitted upon the ground of negligence alone. Neither could the action be maintained upon the theory that the defendant was negligent by reason of a failure to comply with any implied contract, such as was suggested in the Fox Case above, by Justice Ward, as follows:

"While it is undoubtedly true in ordinary cases, in the leasing of buildings, that there is no implied warranty on the part of the lessor that the buildings are fit for the purposes for which they are leased, the rule is different in regard to buildings and structures in which public exhibitions and entertainments are designed to be given, and for admission to which the lessees, directly or indirectly, receive compensation. In such cases the lessors or owners of the buildings or structures hold out to the public that the structures are reasonably safe for the purposes for which they are let or used, and impliedly undertake that due care has been exercised in the erection of the building."

This was the ground upon which Justice Ward based his decision in the case, but a majority of the court did not concur in the decision upon that ground, and we are very sure that the court of appeals did not rest their decision upon any such ground.

There is no conflict in the decisions of the court of appeals upon the subject of such an implied contract as suggested by Justice Ward. The court never gave its assent to any such principle. A brief examination of the cases may be useful, because counsel for plaintiff claims that Justice Ward's opinion was the opinion of this court, and that it was adopted by the court of appeals, and is therefore binding upon us and controlling in the disposition of this appeal.

In the case of Swords v. Edgar, 59 N. Y. 28, 17 Am. Rep. 295, defendant was the owner of one-half of a pier in New York City, and leased it to a steamship company, May 1, 1865, for five years, the lessees to keep it in repair. During the term of the lease plaintiff's intestate, a longshoreman, was working on the pier, when it fell, and he received injuries, from which he died. It was claimed when the lease was made the timbers had become rotten and unfit for use, so that the pier was in an unsafe and dangerous condition, while the floor was apparently sound, and that there was a defect in the original construction, the bridges being too long. The defendant moved for nonsuit on the ground that defendant was not in possession of the pier at the time of the accident, but had leased it with covenant by lessee to keep it in repair. The motion was denied, and the court charged the jury that if the pier was defective when leased, and in consequence the accident happened, the defendant was liable. A recovery by plaintiff was sustained. It was said that the pier, though private property, was held as such for public objects. The plaintiff's intestate was lawfully upon it, and it was as to him the same as a public place or highway. The suffering of the pier to fall into such a state of decay as to become dangerous was the creation of a nuisance, and the rule was applied that an owner who leases property with a nuisance thereon is liable for damages resulting from such nuisance during the term of the lease, although by the terms thereof the lessee has the primary duty of repairing imposed upon him.

In the case of Camp v. Wood, 76 N. Y. 92, 32 Am. Rep. 282, the defendant owned an inn. In the third story was a hall, which he let for one evening for a dance. The entrance to the hall was from the street up two pairs of stairs, one directly over the other. At the foot of the upper flight of stairs was a door leading out upon a piazza or wooden awning, unprotected by any railing. This door occupied the same relative position to the upper flight of stairs that the street door did to the lower flight of stairs. The plaintiff attended the dance, and paid an entrance fee. About 11 o'clock at night he left the hall to go home, went down the upper flight of stairs, and when he came to the bottom, supposing the door in front of him was the one leading into the street, he went out upon the piazza or awning, and fell to the street below, receiving injuries. He sought to recover damages from the owner of the building, the lessor of the hall. The door to the piazza or awning was left open. The court held that the defendant was liable for any negligence with reference to the door, piazza, and awning, they being in his possession, and not in the possession of the lessee of the hall, the plaintiff having been invited to the hall with his consent. This case was referred to in the case of Edwards v. Railroad Co., 98 N. Y. 245, 50 Am. Rep. 659, where it was said:

"In that case the landlord was found guilty of negligence for not keeping safe the portion of the building which remained in his possession and under his control. It was held that the lessor owed some duty to the persons who, with his knowledge and consent, came into his building, and might there be exposed to the danger which caused the accident. The maxim, 'Sic utere,' etc., is sufficient to justify the decision in that case, which is based upon the same principle which imposed liability upon one who digs a hole upon his premises so near a highway that travelers are exposed to the danger of falling therein and being injured."

In the case just quoted from, in 98 N. Y., and 50 Am. Rep., the defendant owned premises in New York City known as "Gilmore's Garden," and leased them for 10 days, for the purpose of a pedestrian exhibition. It was agreed that the lessee might make any changes in the interior of the building that he saw fit. There was no agreement by the lessor to make any changes or repairs. There was a gallery at one end of the building, built shortly before the leasing, which had been used on several other public occasions. It was divided into boxes, and these were supplied with tables and chairs, and were intended for occupation by from four to six persons each, who could be served with refreshments while witnessing the performances on the main floor below. The gallery was built under the supervision of an architect, and was suitable and safe for the purpose for which it was intended, for which it had been used, and for which it was leased. It was not suitable or safe for a crowd of people. The use for which it was designed was apparent to every one. The defendant did not know or suppose any other use was to be made of it, that the tables and chairs were to be removed, and a crowd of people admitted to the boxes. The tables and chairs were removed, a crowd admitted to the boxes, and by reason thereof the gallery fell, and persons were injured. It was held that the defendant, the lessor, was not liable for damages for such injuries; that there was no implied

warranty that the premises leased were fit for occupation or suitable for the purposes for which they were leased, and that there was no distinction in these respects between the lease of a dwelling house and of premises to be used for public purposes; that liability could not be based upon any contract obligation but must rest entirely upon the lessor's neglect or wrong. In illustration of this principle. it was said:

"If he demises premises knowing that they are dangerous, and unfit for the use for which they are hired, and fails to disclose their condition, he is guilty of negligence which will in many cases impose responsibility upon him. If he creates a nuisance upon his own premises, and then demises them, he remains liable for the consequences of the nuisance as the creator thereof, and his tenant is also liable for the continuance of the same nuisance. * * * If he lets a building for a warehouse, knowing that it is so weak and imperfectly constructed that the floors will break down from the weight necessarily to be placed on them, his negligence imposes liability upon him for injury to the person or property of any one who may lawfully be upon the premises, using them for the purposes for which they were demised. If one builds a house for public amusements or entertainments, and lets it for those purposes, knowing that it is so negligently or carelessly built that it is liable to go to pieces in the ordinary use for which it is designed, he is liable to the persons injured through his carelessness."

The court, therefore, makes the liability rest, not upon the principle of implied contract, but solely upon the ground of negligence or wrong. The case was a close one. There was a strong opinion on either side, and the decision rested upon four affirmative votes against three dissenting ones, and it was distinctly stated in the dissenting opinion that:

"While there is generally no implied warranty on the part of the lessor of dwellings or other private houses and buildings that they are fit and adequate to the purposes for which they are leased, yet the rule is different with reference to erections in which public exhibitions and entertainments are designed to be given, and for admission to which the lessors, either directly or indirectly, receive compensation. In such a case, the lessor, by renting the premises for such purpose, and receiving a compensation therefor, holds out to the public that the structure is fit and safe for the purpose for which it is let, and owes a duty to those who attend such entertainment, requiring him to use all reasonable precaution to protect them from at least any danger arising from the known imperfections of the structure."

The court of appeals has never in any way questioned the rule as to the liability of a lessor laid down by the court in that case.

In Wolf v. Kilpatrick, 101 N. Y. 146, 4 N. E. 188, 54 Am. Rep. 672, the injuries resulted from a defective cover to a coal hole in a sidewalk. It was in perfect condition when the property was leased, and was broken during the term of the lease by some third party. The coal hole, with its cover, was not a nuisance when the lease was given, but became such by the breaking of the cover during the term, and the owner had no knowledge or notice of the defect before the injuries were received. The case in 98 N. Y. and 50 Am. Rep. was considered, and the rule as to the owner's liability therein laid down was recognized.

Franklin v. Brown, 118 N. Y. 110, 23 N. E. 126, 6 L. R. A. 770, 16 Am. St. Rep. 744, was an action to recover rent on a lease. A counterclaim was interposed for damages, growing out of the pres-

ence in the demised premises of noxious and unhealthy gases and odors, which came from adjoining premises. Neither party knew of their existence when the lease was made. The lessee examined the property thoroughly before the lease was made, and there was no deceit or false representation by the lessor. It was held, citing 98 N. Y. and 50 Am. Rep., that there was no implied contract and no wrong, and therefore the counterclaim could not be sustained.

In Timlin v. Oil Co., 126 N. Y. 514, 27 N. E. 786, 22 Am. St. Rep. 845, was a case of nuisance,—a dangerous wall,—in which the rule of liability of the owner of premises was extended to a lessee who sublet the premises, and they were in the possession of the subtenant when the injuries were received. 98 N. Y. and 50 Am. Rep. was cited with approval.

I must therefore conclude that the case in 98 N. Y. and 50 Am. Rep. correctly laid down the law which must have controlled it in affirming Fox v. Buffalo Park, above, and which should be followed here.

The liability of a lessor, therefore, cannot be based upon an implied contract in any case, but only upon some negligence or wrong of the lessor, and in that case the defendant was relieved from liability for the fall of the balcony in Gilmore Garden because it did not appear that it was guilty of any negligence or wrong. The balcony was safe and suitable for the purposes for which it was intended and was leased. It was perfectly apparent what it was designed to be used for. It was not safe or suitable for the use which it was put to without the lessor's knowledge, and which imposed a much greater weight and strain upon it, and by reason thereof it fell. Under these circumstances, there was no negligence or wrong on defendant's part causing the injuries. In the case of Fox v. Buffalo Park, the grand stand was constructed in 1892. It was used to witness races, etc., from that time until July 4, 1895, and had withstood former crowds without accident. It was leased to the Press Cycling Club of Buffalo for one day, July 4, 1895, to be used to witness bicycle races. It was claimed it fell by reason of improper construction; it was not sufficiently strong. The court charged the jury that if the stand was improperly constructed, so that it was a dangerous structure, the defendant was responsible for its condition, without having its attention called to the defects, and if it was so defective that it was dangerous to be used for the purposes for which it was leased then the plaintiff could recover, but if it was a fairly reasonably well-constructed structure, and by some unusual strain, that nobody had any thought it would be subjected to, it was broken down on the occasion of this accident, then the plaintiff could not recover. A verdict was rendered for the defendant, and was affirmed in the appellate division and the court of appeals. It is interesting to note that Justice Ward, instead of following the decision of the court in 98 N. Y. and 50 Am. Rep., laid down as a basis for his decision the rule found in the dissenting opinion quoted above, using very much the same language, and citing many of the same authorities, and stated that the case in 98 N. Y. and 50 Am. Rep. did not aid the defendant and was not pertinent

to the case under consideration. The opinions by Justices Green and Adams did recognize the rule laid down by 98 N. Y. and 50 Am. Rep., and discussed the question merely whether the defendant was guilty of negligence which rendered it liable. Justice Green found negligence in a failure to inspect, and to ascertain and repair or correct defects in the structure, while Justice Adams regarded the question of negligence as dependent upon defendant's knowledge of the defects complained of. It seems to me, in view of the charge made by the court, it must have had the case in 98 N. Y. and 50 Am. Rep. before it, and have fully appreciated what that case held, and intended to follow it. It seems to have kept well within the rules laid down in that case, and the court of appeals may well have affirmed upon the authority of that case. In each case the question of liability was treated as one resting, not upon an implied contract, but upon negligence. In each the lessor was regarded as responsible for the original construction of the structure. In 98 N. Y. and 50 Am. Rep. it was conceded to be the duty of the lessor to see that the balcony was so constructed as to be safe and suitable for the purposes for which it was leased, and that a failure to perform such duty would be negligence, and the defendant was relieved from liability solely upon the ground that the evidence showed that the balcony fell by reason of its being subjected to a weight and strain for which it was never intended,—a use for which it was never leased. In the Fox Case the court charged the same rule of duty, and that the plaintiff was not entitled to recover in case the stand fell by reason of an unusual strain, which nobody had any thought it would be subjected to. The cases in the court of appeals all seem, therefore, to be in harmony.

There was no nuisance nor implied contract in this case. There was merely the question of negligence, and we are to determine whether under the evidence, construed most favorably to the plaintiff, the defendant could be made liable for the death of plaintiff's intestate, on the ground of its negligence in the construction and leasing the toboggan slide. The only theory upon which the defendant could be charged with negligence was that the slide was constructed and leased for the use of the public, as a place of amusement or entertainment, and that the public was allowed to use it for a fee to be charged them, and that the defendant shared in such compensation indirectly, by receiving a rental for the premises from the lessee, and that it was in its original construction not reasonably safe or suitable for the purposes for which it was constructed and leased. All the facts involved in this proposition were conceded or found by the jury upon sufficient evidence. Upon such facts, were the jury justified in finding the further conclusion of fact, the defendant's negligence?

In 98 N. Y. and 50 Am. Rep., it was assumed that the lessor would have been liable under a somewhat similar state of facts. It was said in the prevailing opinion:

"If it had been shown, or could reasonably be inferred, that the defendant knew how the gallery was to be used, and that it was dangerous and unfit for that use, and that it concealed its knowledge and did nothing to guard

against the danger, no argument would be needed to establish its liability, as that would rest upon obvious principles of law universally applicable."

In the Fox Case the court of appeals sustained a finding of negligence by the jury, under a similar state of facts as that referred to by the court in 98 N. Y. and 50 Am. Rep., above quoted. There it did not appear the defendant had actual knowledge of the defects, but it was apparently found that defendant was chargeable with knowledge, inasmuch as the stand was constructed under the supervision of its architect. It did not disclose the defects, and neither the lessee nor the public were aware of them.

Apparently the only distinction between those two cases and the one I am considering is that in those cases the defects were latent and concealed, or, at least, not disclosed to the lessee or the public; while in this case the slide was actually constructed and used by the lessee, and the alleged defect was not only known to him, but was open, apparent, and visible to the public, and to any and all persons having occasion to make use of the slide. Did this consideration relieve the defendant from liability for its negligence, which would otherwise exist? While it would be a consideration bearing upon the question of contributory negligence, I am unable to see how it would affect the question of defendant's negligence, or relieve the defendant from liability, except upon the theory that the death was the result of the contributory negligence of plaintiff's intestate, and not, therefore, of defendant's negligence. That the defective construction caused the accident there can be little doubt. The platform and step being wet and slippery, the plaintiff's intestate being thrown feet foremost towards the edge of the platform, there being nothing on the floor for his feet to strike, and there being room under the lower rail for his body to go through, he necessarily went off the platform and fell to the ground, where he met his death. It was fortunate that no other accidents of a like character had taken place. The jury was justified in finding the construction was a dangerous one, in view of the defect claimed.

It is suggested by plaintiff's counsel that the court charged the jury that, if the construction was dangerous and unsafe, the plaintiff might recover, in the absence of contributory negligence, whereas the duty of the defendant was only to furnish a construction that was reasonably safe and free from danger; that the charge was erroneous in this respect, and was duly excepted to. The court did state the rule correctly at first, saying:

"It devolves upon the plaintiff to satisfy you that the accident occurred by reason of the negligence of the defendant in omitting to make the platform reasonably safe for those who paid their money and went upon it for the purpose of riding down the toboggan slide."

In stating the proposition as to the negligence of the defendant later in the charge, the word "reasonably" was omitted, and to one of these later propositions the defendant excepted, but there was nothing in the exception to call the attention of the court to the specific error claimed, and there was no request that the court insert the word "reasonably" in the part of the charge excepted to. I do not, under these circumstances, regard the question as fairly

raised, and do not think the jury were in any way misled to the injury of the defendant.

The question of contributory negligence was fairly submitted to the jury, and no exceptions were taken to such submission, either as to its substance, or that there was no evidence to support a verdict for the plaintiff upon that question. The defendant's counsel merely requested the court to charge that if the deceased had the same knowledge of the danger that the defendant had then there could be no recovery. The court declined to vary its charge upon that point, and there was an exception. I think this refusal to charge, in view of what the court had already said to the jury on the question of contributory negligence, was proper.

My conclusion is that no error was committed in the trial, that the exceptions taken by defendant should be overruled, its motion for a new trial should be denied, and judgment ordered for plaintiff upon the verdict, with costs.

SPRING, J., concurs.